**CONNERS v G M McKELVEY CO**

Ohio Appeals, 7th Dist, Mahoning Co

No 2347. Decided April 2, 1937

Morris Mendelssohn, Youngstown, and William E. Pfau, Youngstown, for appellee.
Charles F. Scanlon, Akron, for appellant.

## OPINION

By ROBERTS, J.

This cause is in this court on an appeal of law from the Court of Common Pleas, in which action Betty Conners was plaintiff and appellee in this court, and the G. M. McKelvey Company was defendant in the lower court and appellant herein. The parties will hereinafter be alluded to as plaintiff and defendant as in the lower court.

The plaintiff recovered a verdict from the defendant in the sum of $9,000.00 for damages which she claimed to have received by slipping and falling upon the fifth floor of the department store of the defendant. on the 20th day of December, 1934. It is the contention of the counsel for the defendant that reversible error occurred during the trial to the jury and that because thereof the judgment of the Court of Common Pleas should be reversed.

Allegations of the amended petition of the plaintiff which are not disputed may be stated as follows: That at the time hereinafter mentioned the defendant was, and still is, a corporation organized and existing and engaged in the department store business in the city of Youngstown, and maintained a store located at 210 West Federal Street in said city, which store at the time complained of was open to the general public for the purpose of carrying on business, and that the doors of said store were open to the general public for the purpose of conducting its mercantile business, and prospective customers were invited to enter for the purpose of inspecting and purchasing goods. Further allegations of the petition are, in substance, as follows: That on or about the 20th day of December, 1934, between 2:30 and 3:00 o'clock P. M. of said date, at which hour the plaintiff entered the store of the defendant company at its entrance on West Federal Street, and took the elevator to the fifth floor with the intention of making a purchase, and that when said plaintiff did make a purchase and proceeded toward the elevator her right foot came in contact with a slippery foreign matter, namely a puddle, which seemed to be an oily substance filled with dirt and matter, the exact nature of which this plaintiff does not know, but is well known to the defendant, which this defendant, through its duly authorized agents and employees, acting within the scope and course of their employment, had knowledge of or should have had knowledge of in the exercise of ordinary care, which they had caused and allowed to remain on said floor, and as a result of this plaintiff stepped on said puddle of oily substance, described as aforesaid, and was thereby caused to slip and fall with great force and violence, causing her back to come in violent contact with the floor, and causing her to sustain the following injuries, to-wit:

Severe injury to the back in the sacro lumbar region, resulting in a spondylolisthesis of the fifth lumbar vertebrae on the top of the sacrum. The fifth lumbar vertebrae is displaced over 1 cm. forward on the top of the sacrum.

Severe bruising, contusing, injuring, wrenching, straining, spraining and twist-the flesh, muscles and ligaments of the left knee. Bruising, contusing, injuring, wrenching, straining, spraining and twisting the flesh, muscles, nerves and ligaments of the left wrist.

Plaintiff says that as a result of said injuries she sustained a severe nervous shock, which has caused her to become extremely nervous and irritable; that each and all of her said injuries were directly and proximately, solely and wholly caused and brought about by and through the gross

carelessness and negligence of this defendant in the following respects, to-wit:

1. In and about carelessly and negligently failing and neglecting to warn plaintiff of the existence of said dangerous floor and of the danger arising therefrom, as aforesaid.

2. In and about carelessly and negligently failing and neglecting to maintain and caused to be maintained the aforesaid floor in a reasonably safe condition, to walk or travel upon, as aforesaid.

3. In and about carelessly and negligently maintaining or causing to be maintained said floor at said place when defendant knew, or, in the exercise of ordinary care, ought to have known of said slippery foreign matter on said floor, thereby causing injuries to this plaintiff, as aforesaid.

4. In and about carelessly and negligently causing and allowing said slippery foreign matter to remain on said floor.

Plaintiff says that the defendant knew, or in the exercise of ordinary care, for the safety of this plaintiff, should have known of all these conditions and dangers, but that she did not know of the same, nor had she equal means or opportunity with the defendant of knowing or appreciating same, so that wholly without fault or negligence on her part, but solely through the negligence of the defendant herein, proximately operating, she was injured as aforesaid.

Then follow further allegations with regard to the nature and severity of the alleged injuries, the extent of medical services which she received and the permanency of her injuries. No answer to the defendant was filed subsequent to the filing of the amended petition, but defendant received leave to refile its answer, which was not done; however, nothing is claimed for that and the failure of the plaintiff to file a reply. The case seems to have heretofore been considered as if such answer and reply were filed and will now be likewise considered.

The answer of the defendant, after admitting allegations so specified, admits that on or about the 20th day of December, 1934, the plaintiff fell while in said store; that as a result of such fall the plaintiff sustained some injury, but the defendant denies that the plaintiff was caused to fall for the reasons and in the manner alleged in the plaintiff's petition. Further answering, the defendant denies generally and specifically each and every allegation in the plaintiff's petition not herein expressly admitted to be true. For a second defense the defendant says that the plaintiff directly contributed to her own injuries by failing to exercise that degree of care which she was bound to exercise while she was on the premises of the defendant.

The defendant claims that reversible error occurred during the trial in several respects, as follows:

1. The trial court erred in overruling the motions for directed verdict made by the defendant below at the close of the plaintiff's evidence and at the close of all the evidence.

This contention needs no particular specific discussion, for the reason that whether or not such motion should have been followed or overruled depends upon other conditions which indicated whether or not a cause of action had been presented entitled to recognition.

2. Damages were excessive and appeared to have been given under the influence of passion and prejudice.

3. The judgment of the court below is not sustained by competent or credible evidence and is manifestly against the weight of the evidence.

The third specification above stated will be taken up and considered first. The attorney for the plaintiff made an opening statement to the jury of considerable length, in which he said, as appears on page 5 of the record:

"What apparently had happened was that one of the boards had sprung up a little bit so that the board that was to the side of it was a little bit lower, probably not more than a quarter inch or even one-sixteenth of an inch, just lower far enough that it made the floor a little bit uneven and allowed oil and dirt to accumulate to a certain extent on the floor and there was a little puddle or spot probably not more than as big around as those four blocks, which was greasy and dirty and had been left like that for some length of time. There was a little ridge around the north-early side of this spot, left a mark there that was still there a week ago."

This opening statement was presumably the first information which the jury received concerning the nature of the spot,

and about which it would become their duty to decide whether or not there had been actionable negligence on the part of the defendant and for which the plaintiff would be entitled to recover damages by the verdict of such jury. The jury would be particularly alert at this time to know what was claimed to have been the wrongful conduct on the part of the defendant and giving the plaintiff the right to receive damages therefor.

This statement, deliberately made at this psychological time, when it was particularly important, was not true, as indicated by the evidence in the case. The contention in behalf of the plaintiff was that at the place where the plaintiff slipped, there was a spot some ten inches in diameter or some wet or slippery substance, being oily or greasy, as such testimony indicates. There was no evidence of any recent oiling of the floor, but the evidence upon the subject was to the effect that the floor had not been oiled since some eight months previous to the accident. There was no evidence that there was a depression at this place which might contain and maintain for a long period any slippery liquid or substance. The evidence indicated that this was a wooden floor; that with wear and use it had in some places become worn a little more than at others, but that several months before the accident the floor had been gone over, planed and sanded and smoothed, and was without any such depression as stated by counsel for the plaintiff. It may be presumed to have been understood that this being a wooden floor, of a somewhat porous nature that it was important to indicate such condition whereby a sufficient quantity of such slippery substance would be retained long enough and under such conditions in existence as to be present and cause the fall of the plaintiff, hence this figment of imagination about the depression. It does need saying that counsel ought not to have made such a statement, the result of which could not have been otherwise than intended to prejudice the minds of the jury upon this particular proposition without expected ability to substantiate such statement by evidence. No effort was made in the trial to so prove nor excuse given for not so proving. Of course this was not evidence in the case and very likely the court some time, as is usually done, instructed instructed the jury that the statements of counsel were not evidence. However, it is apprehended that this first and important

matter accomplished an intended purpose to first get to the minds of the jury a reasonable explanation of the continued presence of this alleged dangerous condition.

The nature of the issues in this case requires some reference to the testimony of the witnesses. It is not denied that the plaintiff, at the time alleged, went to the McKelvey store and took an elevator to the fifth floor about two-thirty to three o'clock P. M. This alleged accident occurred on the 20th of December, during the Christmas week or four days before Christmas, when the store was having a large trade and was visited by a large number of people. The plaintiff, Mrs. Conners, was accompanied, as she testified, by her sister-in-law, Adele Scanlon, Mrs. Scanlon's two little children, and by Betty Jane Conners, the eleven year old daughter of the plaintiff. She had parked her automobile at the Square and then had proceeded down West Federal Street, some two and a half blocks, to the McKelvey store. It was a wet, snowy, slushy day. She, with her party proceeded to the elevator and ascended to the fifth floor, for the purpose, as she said, of permitting her nieces to see Santa Claus. Mrs. Scanlon, her two little children and Betty Jane Conners, were approaching a display of toys in front of and a few feet distant from the elevator. The attention of all, unless it be the plaintiff, was particularly directed to some little game which was being exhibited by one of the clerks, a young lady. The ball fell on to the floor and rolled partially toward and past the elevators. There were four elevators. The plaintiff refers to one which she observed going down, which was crowded. Then she says she naturally walked toward the north end of the store, watching the lights on the other elevators. Why she was watching the lights unless for the purpose of avoiding the one which had just gone down crowded, and intending to take the next one, is not indicated, but if this was the explanation intended by the plaintiff, then it is not understood why she was leaving her party and attempting to take the elevator down as the attention of the other members of the party was engaged in looking at these toys and the playing of this game with a ball and hoop. Plaintiff then testifies:

"A. As I was walking along I felt my foot slip, my other foot went back and to protect myself I put my hand back and I came down with a thump right on the tail bone of my spine.

Q. Which foot was it that slipped?

A. My right foot.

Q. Which way did it slip?

A. Straight in front of me.

Q. At the time you were walking in what direction?

A. North.

Q. As your right foot slipped out from under you, what happened to your left foot or leg?

A. It bent and hit on the inside of the knee on the floor straight back.

Q. Then what happened to you?

A. I put this hand back, the left hand.

Q. How far did the right foot go out?

A. It went right out, straight out.

Q. Clear out, do you mean?

A. Yes, sir.

* * *

Q. Did you get up yourself or did some one help you up?

A. My youngster helped me.

* * *

Q. You say she,—you mean your daughter?

A. My daughter, yes."

She then testifies she was taken to the sixth floor and the manager came to her.

"Q. Before you left did you notice whether or not there was any mark on the floor made by your heel?

A. Yes.

Q. Tell the jury what kind of a mark it was?

A. Well, it was just a straight line, the way my heel dragged right on the floor and went straight out as if you would take one instrument and just draw a line straight and a separation from this little pool of I don't know what it was, but it caused the fall I am sure."

Mrs. Scanlon, the sister-in-law, testified, commencing on page 37 of the record. She had with her her two little daughters, one three and the other four years of age. She testifies to going up in the elevator with the plaintiff and buying two twirl balls for her little children. These purchases she made at the table that was between the third and fourth elevators going north. Page 39:

"Q. Did you see your sister-in-law fall?

A. No sir, I didn't see her fall.

Q. What was the first you noticed of anything out of the ordinary?

A. Her daughter picking her up, when she got up.

Q. And where was it with reference to the elevators where you saw her daughter helping her up?

A. It was between the third and fourth elevators the same direction, north.

Q. Were you some little distance towards the front of the store?

A. Yes sir, at the time my back was turned toward the elevators, my attention was centered on the youngsters and they were playing with these toys there.

Q. Now, then, by the way, while I think about it, did you notice any ball drop off these toys while you were there, did you notice any ball drop?

A. No, I didn't.

Q. Well, what did you do then when you saw Mrs. Conners' daughter helping pick her up?

A. I went to assist her."

She testifies further to the plaintiff having been taken up to the emergency room on the sixth floor and she waited on the fifth floor with her children. On page 40 she testifies:

"Q. Did you look on the floor there where Mrs. Conners had fallen?

A. I noticed a mark, a spot on the floor, as we were taking the elevator.

Q. That is, as you came in?

A. No sir as we were going out.

Q. I want you to tell us just what it was you saw?

A. Well, it was a dark irregular spot, I suppose a foot or so in diameter, it was a spot that was darker than the rest of the floor. That is all I could say about it.

Q. Did you notice it closely enough to see if there was any mark made in it apparently by Mrs. Connors' heel?

A. No, I didn't.

Q. Did you observe Mrs. Conners' coat afterward, did you notice her coat whether it was clear, dirty or otherwise?

A. I didn't.

Q. Then where did you go afterwards?

A. I don't understand your question.

Q. Did you leave the store then later?

A. After she left the emergency room?

Q. Yes.

A. We went.

Q. Where did you go then?

A. We first put my children on the bus and Mrs. Conners was very sick and we went over to Petrakos', I thought perhaps a cup of coffee would settle her and we went over to Petrakos for a cup of coffee.

Q. Then where did you go?

A. We went right down to the Diamond

where her car was parked and waited for her husband."

On page 42:

"Q. Can you describe the spot any better yourself than you have, saying it was dark, what else did you observe or didn't you pay any special attention?

A. I didn't pay any particular attention to it other than as we were going on the elevator this spot was wet or dark; it was very much darker than the rest of the floor, it was conspicuous, anyone could notice it.

That is all."

On page 43, in cross examination, Mrs. Scanlon is inquired of:

"Q. You don't know what this spot was composed of, do you?

A. No sir, I don't.

Q. It was a slushy day outside, wasn't it?

A. Yes, it was very wet.

Q. People tracking in a lot of moisture on their shoes that day?

A. Yes, sir."

The daughter, Betty Jane, was next called as a witness, and testifies to the party going up in the elevator, page 47 of the record:

"Q. Were you watching her there or watching the balls as your aunty was buying them?

A. Yes.

Q. While you were doing that did you notice a ball fall off the counter or fall down?

A. Yes.

Q. Do you know who dropped it or how it happened to fall?

A. My Aunt Ella was trying to see what to do with the toys when she dropped it.

Q. Do you know which way it went, the ball?

A. Toward the elevator.

Q. Do you know who picked it up?

A. I did.

Q. What did you see of your mother's fall, did you see her fall?

A. Well, as I went to get the ball I saw my mother look up at the elevator and her right foot slipped from under her.

Q. Had you picked up the ball yet?

A. Yes.

Q. Can you tell us, was your mother ahead of you or you ahead of your mother?

A. I was ahead of my mother."

Record page 48:

"Q. When you helped her up what did you do, did you brush her off?

A. Yes.

Q. Did she have a coat on?

A. Yes.

Q. When you went to brush her off how were your hands?

A. Wet.

Q. Anything besides wet?

A. Well—

Q. Were they clean?

A. No, they weren't exactly clean but they weren't very dirty.

Q. Were they greasy?

A. Yes, oily."

This question was leading and objectionable. The girl had told what she recalled as to the condition of her hands but she needed the prompting of the attorney as to their being greasy. The attorney of the defendant got no further with evidently an objection than to say "Well—."

"Q. How was the back of your mother's coat, I mean was it clean or not after she had gotten up?

A. I didn't notice that.

Q. You just noticed what was on your hands?

A. Yes."

Page 49:

"Q. Did you look to see where she had fallen, did you look at the floor?

A. Yes.

Q. What did you see on the floor?

A. A dirty spot.

Q. Anything else you saw on the floor?

A. The mark of her heel, a wet mark.

Q. About how long was that mark, could you tell us?

A. I imagine about that long.

Q. You are indicating about ten inches. What kind of a mark did it make?

A. Sort of a slippery mark.

Q. You say there was a spot, what kind of a spot was there on the floor, how would you tell us it was?

A. It looked like it was a puddle of some sort but it was dirty.

Q. Dirty what, as near as you can tell, us, how did it look to you?

A. It looked oily on top of it.

Q. Was it dark or light, would you say?

A. Dark."

On page 17 the plaintiff testifies:

"Q. What about your clothes?

A. The back of my coat was quite dirty and when I brushed my hand down to hold

my back I know my hand was damp; I held my back.'

Q. Do you recall what kind of a day it was outside?

A. It was a murky, misty day, it wasn't a direct snow, but yet the sidewalks were wet and damp."

§ Plaintiff testified to the effect that after she went back up to the Square to her automobile she found that her coat had a wet spot, presumably where she had fallen. This was evidently taken to indicate that her coat became wet when she fell upon a wet spot upon the floor. It would seem to be much more probable that her coat became wet while she was out in the storm, before she went to the store or after she left the store and went back to the Public Square to her car. If wet before, the wet spot on the floor of the store was not discovered until after she fell. That might offer some explanation of a dampness upon the floor where she claims to have fallen. Her shoes were suede, slightly over-run and of ordinary high heels. With a long exposure to the snow and slush before going into the store, it is a reasonable presumption that these shoes were quite well soaked with moisture. If a dry shoe would slip on a wet spot on a wooden floor, it is not improbable that a wet shoe would slip on a dry floor. Witnesses testifying for the plaintiff as to the condition of the floor, or that the floor was wet, were the plaintiff herself, who made no particular examination but indicated that it seemed to be dirty or oily; her sister in law, Mrs. Scanlon, did not testify to anything further than that she saw a damp spot on the floor, and her daughter testified that there was a wet spot, somewhat dirty, and, when prompted by counsel for the plaintiff, further stated that it appeared to be greasy or oily.

L. B. McKelvey testified for the defendant. He is president of the defendant company. In answer to a question as to how often he visited the various floors of the store, he answered usually once a day, "not every day, I wouldn't say. I try to go around every day." (R. p. 107). He says that in May, 1934, the floor was repaired, sanded and oiled; that this floor is cleaned every day, either at night or early in the morning, the wooden floors were scrubbed. He had no knowledge of any spot on the floor at the place and time in question. He was not able to fix the exact date when the floor was last oiled, but Mr. Brakeman, who was called as a witness, testified in the

record, commencing on page 129, that he has worked for the company about nine years as house carpenter; that the fifth floor is composed of wood; that he has charge of repairs; that in 1934 some work was done of this floor, columns removed, column enclosures repaired, the floor and all bad places were taken out and replaced and the oil floors sanded and refinished, the entire ceiling and floor was re-sanded and refinished in April, 1934; that a wood floor has hard and soft grain and wears in time uneven, the sander, they take and sand it cross grain first and level it up, and then with finer sandpaper go lengthwise with the electric sanding machine and smooth it down and refinish it and clean it up like a new floor; that in the month of December, 1934, it would be almost as good as a new floor; that there would be no change except natural wear.

The foregoing constitutes a substantial statement of the evidence thus far, with the result that not only is there an absence of any evidence tending to indicate oil upon the floor other than testified to by Mrs. Conners and her daughter, but the evidence indicates with considerable certainty the absence of oil, the presence of which could only be accounted for by oiling the floor, something which had not been done for eight months.

On behalf of the plaintiff there seems to have been a sentiment that oil was essential to constitute a cause of action. The defendant called as a witness Natalid Ridel, who testified, commencing on page 110 of the record. She was an employe of the defendant company, in its service at the time the plaintiff fell and in close proximity to that place she was demonstrating a cookie press, and her stand was located immediately contiguous to the toys which the plaintiff and those accompanying her at the time of the accident were engaged in inspecting. She testifies at page 112 of the record that she saw a woman fall near the northerly elevator on that afternoon, about two or two-thirty P. M. She said:

"A. I had just finished a demonstration and the people had all cleared from in front of my table and I was standing there when these people came down, these ladies come down towards the door, going back into the bake shop to my left, and there was a game at the right of me.

Q. What kind of a game was that, do you know?

A. I really don't know what they call, it was either hi-lo or hi-yo, something like

that, I don't recall the name of the plaything, it was a hoop with a ball on the inside of it and this child and these women went over and picked this toy up and was playing with it, and at that time the ball had fell out and rolled toward this door towards the far north and this lady ran after this ball along with the child.

Q. Along with what kind of a child?
A. A little girl."

This contradicts the plaintiff, who testified that she did not run after the ball.

"Q. And then what did you see happen?
A. Well, as the little girl started running, this lady ran, too, and then her heel went out from in under her and she fell down and she caught herself with her hand."

It will be observed that this witness does not say that her foot slipped but that her heel went out from under her.

"Q. After the lady was picked from the floor, where did she go then, do you know?
A. She went up to the nurse's room on the 6th floor.

Q. Did you look at the floor where this woman had fallen?
A. I certainly did.

Q. What did you see on the floor?
A. There wasn't a thing on the floor.

Q. Was there any spot of any kind on the floor?
A. No, sir.

Q. Of oil?
A. No spot of any kind.

Q. Well, was there any marks of any kind?
A. No sir, it was absolutely clean.

Q. Was there anybody else waiting for the elevator there at that time?
A. No, not as I recall.

Q. Do you recall whether or not you observed what kind of heels this lady wore?
A. Yes, the heels on her shoes were slightly run over and they were a wooden heel.

Q. They looked like wooden?
A. Yes.

Q. Was there any heel marks on the floor?
A. Yes, a slight heel mark."

Record page 116:
"Q. Now, as you stood there during that day demonstrating this cookie press, can you tell us whether or not you had occasion to observe this floor to the left of your table and in front of your table where you were demonstrating?
A. I certainly did.

Q. During the morning of that occurrence at any time did you see any spot about ten or twelve inches in diameter of a greasy substance on the floor?
A. No sir, there was nothing. It was absolutely clean, because that is practically all I had to do in between times, was to look around and notice things like that."

The defendant also called as a witness Ethel McClafferty, who testified, commencing on page 120 of the record. She was employed at the emergency room as a nurse. That was her position during the month of December, 1934.

"Q. Now, do you recall that a lady by the name of Mrs. Betty Conners was brought to the emergency room on or about December 20th, 1934, some time in the afternoon of that day?
A. Yes sir.

Q. You don't recall that?
A. Yes, sir.

Q. Try to talk as loud as you can?
A. I have a cold; I can't talk very much louder.

Q. Can you tell us what you observed about this particular woman at the time she came to the emergency room with reference to any bruises or marks of any kind?
A. She had a bruise inside of the right leg and she complained of her right thumb hurting her, but there was no marks on the thumb.

Q. Where, with reference to this right leg, was this bruise?
A. Right on the inside.

Q. Of the knee?
A. Yes, sir.

Q. Did you render first aid to her?
A. Yes, sir.

Q. What did you do?
A. I just put some iodine on it because there was just a little bruise and that is all she needed.

Q. Did she tell you how this accident happened, how she came to fall there?
A. Yes sir.

Q. What did she tell you as to how she fell there in the G. M. McKelvey store?
A. She said there was a child playing with the hi-lo game that was being demonstrated on the fifth floor and the ball had slipped from the hoop and she went to get the ball for the child when she turned over on her ankle and hurt her knee."

This contradicts the testimony of the plaintiff, who denied that she went to get

the ball, and claimed that her foot slipped on the floor, rather than her ankle turned over.

Page 122:

"Q. Then after you rendered first aid did she leave the emergency room?

A. Yes sir.

Q. Then what did you do, did you go up to the fifth floor?

A. Yes sir, examined the floor.

Q. Went down to the fifth floor?

A. Yes sir.

Q. Did you examine the floor in the vicinity of the northerly elevator as to any substances on the floor?

A. Yes, sir.

Q. And how soon after you had rendered this first aid did you go up there to examine this floor?

A. About ten minutes, I should say.

Q. About ten minutes?

A. Yes.

Q. What did you observe with reference to the floor as to any grease spot or anything?

A. There was no grease spots or anything on the floor. The floor was perfectly clear and clean.

Q. That is a wood floor up there, is it?

A. Yes, sir.

Q. Did you observe the heels, the type of heels that this lady wore?

A. They were sort of medium heels.

Q. And what was their condition, if you know?

A. They were slightly run over."

On page 127 this witness was inquired of with regard to a report:

"Q. That is your handwriting?

A. Yes, sir.

Q. That is the report you make out, is that right?

A. Yes, sir.

Q. At the time the accident happens?

A. Yes, sir.

Q. Is this your handwriting?

A. Yes sir, all mine.

Q. And on the bottom of defendant's exhibit A you wrote down what this woman told you, is that correct?

A. Yer, sir.

Q. Mrs. McClafferty, Mr. Becker told you to come here, is that right?

A. Yes sir.

Q. And do you recall making out this report?

A. Yes sir, I do.

Q. And you made out that report on the date shown on it?

A. Yes, sir."

After cross examination by Mr. Pfau the report was offered in evidence by Mr. Scanlon, to which counsel for the plaintiff objected and the court sustained the objection as not being competent.

There was a dispute between the plaintiff in this case and this witness as to which knee and which thumb was injured, the plaintiff testifying the left and the nurse the right. Counsel for the defendant offered a report, made presumably to an insurance company, of the accident, attempting to prove that the witness at that time reported an injury to the right leg and thumb, and it is significant that counsel for the plaintiff objected to such corroboration of the plaintiff's testimony.

We come now to make some comment on the testimony of another witness named Madeline Dugan. In the absence of her testimony in behalf of the plaintiff considerable danger was evidently apprehended, for the reason that there was no evidence tending to indicate that the defendant, or anyone in its employ, ever saw or knew of this damp spot, of whatever it may have consisted, upon the floor, and that there was a duty resting upon the plaintiff to establish the existence of this spot for such a sufficient length of time prior to the accident that the jury might assume therefrom that the defendant had acquired knowledge of this condition and opportunity had been afforded to remove it. Then, like manna from Heaven came the testimony of Mrs. Dugan. She testified, commencing on page 54 of the record, that she is a married woman, living in Youngstown, and that she has known the plaintiff twelve or thirteen years; that she had not visited with her in the last three or four years. She was asked this question:

"Q. Did you have occasion to see her, did you happen to see her along in December, shortly before Christmas, in 1934?

A. Yes sir, one night I went down to ask her if she would buy some salve. I was selling some.

Q. When you were down to see her to sell her salve, where was she?

A. Laying on the davenport.

Q. At that time did she tell you of having fallen in McKelvey's store?

A. Yes sir, I was kidding her about laying down.

Q. Do you know when it was you called with reference to the day of the fall, do you know how long after the fall it was?

A. About four days.

Q. When she told you about that, do you recall then of having been in the store?

A. Yes, I do. I was there on a Thursday morning looking for baby dolls.

Q. On a Thursday morning, so if December 20 is Thursday, '34, it would be whatever date that Thursday was just before Christmas?

A. Yes, sir.

Q. And you were in McKelvey's in the morning of that day looking for dolls?

A. Yes, sir."

She then relates that she went there about eleven or eleven-thirty in the forenoon and that she went up in the second elevator from the street.

"Q. After you got off the second elevator from the street, which way did you go?

A. North.

Q. Was there anything out of the ordinary about yourself as you got off the elevator that day?

A. I had something stuck on my heel and I was scraping it along the floor.

* * *

Q. Did you observe anything unusual about the floor there at any place at that time?

A. Well, I did notice a dark spot in the floor, there, was two or three shades darker than the floor.

Q. Where was that spot located?

A. Well, it was between the third and fourth elevator as I was walking north in the store.

Q. And about how far out from the elevator?

A. Well, I would say about four to five feet.

Q. Now, will you tell the jury about how big the spot was, give us some idea of it?

A. It was about the size of that. Indicating.

Q. That is, about nine or ten inches, or eleven inches, perhaps, in diameter?

A. Around that, yes.

Q. What kind of a looking spot was it, you say it was dark. what did it look to be?

A. To me it looked like it might have been oil or something on the floor.

Q. And darker?

A. Darker than the floor, yes."

And so the breach is claimed to have been filled. This woman testified that she turned to go to the north end of the fifth floor to look at dolls, in which she was interested in behalf of some children, and she did so do. Mr. Seifert testified (R. 136) that he was superintendent of this company and that there were no dolls at the north end of the fifth floor, where Mrs. Dugan claims she looked at them. If this testimony is true, the age of miracles is not past, that this woman, who hadn't seen the plaintiff for years, should call on her four days after the accident, learn of its occurrence and then recall as a fact that she had been to this particular place where the accident happened four days before in the forenoon, about eleven o'clock, and see the spot. If true, it is a remarkable occurrence and fulfills the requirements of the plaintiff's case.

The decided preponderance of the evidence, in this case, as testified to on behalf of the plaintiff, does not indicate further than that there was a wet spot somewhat darker in color. As to whether there was oil or not has already been mentioned herein. Eliminating the presence of oil it is reasonable to assume that on this wet, slushy day, with a multitude of people going up these elevators and passing this particular place in holiday week would carry considerable moisture upon their feet, and that logically would seem to account for the presence of moisture and its continued existence if the conditions did not change. If, however, the wet condition was not constantly contributed to by customers walking over this place, the heat of the room, the absorption of the floor and the tramping of the people would very soon dry it up and it would go out of existence after Mrs. Dugan saw it before the plaintiff was there.

The testimony of Ethel McClafferty and Natalie Ridel was direct and positive that no such condition existed. They had reason to observe and remember, because so doing was in the line of their duty.

Counsel for the defendant alleged contributory negligence but does not seem to have attempted to develop it during the trial. It is not thought to be improbable that a high heel, attached to a flimsy, water-soaked shoe, would be so insecure that that would be the cause of the turning of the foot or the slipping of the foot, with the resulting accident. Some time in the future, in the multitude of this kind of cases some attorney may have the temerity to allege the wearing of this kind of high heel shoe, under these conditions to be contributory negligence.

The defendant alleges excessive damages but did not call any medical witnesses nor seem to develop that proposition, which in

the opinion of this court has not been sufficiently sustained. This court is, however, after a very careful consideration of this evidence, impressed with the belief that the verdict of the jury in this ▇▇▇▇ case was against the manifest weight of the evidence, and for that reason the cause is reversed.

Attention is directed to the case of **The S. S. Kresge Co. v Fader, 116 Oh St 718**, the syllabi of which case reads as follows:

"1. Owners or lessees of stores owe a duty to the patrons of the store to exercise ordinary care to prevent accident and injury to the patrons while in the store, but they are not insurers against all accidents and injuries to such patrons while in the store.

"2. The fact that during a rain-storm some water has blown into the front of a store on account of the opening of the door to admit customers, and the incoming shoppers during such rain-storm carry in moisture on their clothing and feet and umbrellas, and thereby and only thereby cause the floor inside the door and near thereto to become damp and more slippery than is the dry floor in other parts of the store, will not give rise to a cause of action against the owner or lessee of the store in favor of a later incoming patron who slips or falls on such damp floor and is injured by such fall."

In the case of **The J. C. Penny Co., Inc. v Robison, 128 Oh St 626**, it is said in the 5th paragraph of the syllabi:

"5. Testimony to the effect that after the customer fell there was a mark on the floor where the customer's heel had slipped, that she had some oil or black substance on her hand, dress and stockings, and that the rubber tap had come off the heel of the customer's shoe in falling, affords no question for the jury. Considering such testimony in its most favorable light toward the customer, it constitutes no proof of negligence on the part of the storekeeper."

In the case of **Cleveland Athletic Association Co. et v Bending, 129 Oh St 152**, the syllabi reads as follows:

"1. To make the owner and lessee of a building liable in damages to a person who, while walking across the entrance-way of such building, slipped with one foot and caught the other foot on something, she knows not what, and fell upon the floor of such entrance way, sustaining injury, there must have been some negligent act

or omission on the part of such owner or lessee which caused such person to slip and fall.

"2. Evidence that a person, in entering a building, started to walk across a marble floor which was worn down by foot traffic not more than one-sixteenth to one-eighth of an inch, and that while walking across such marble floor, slipped with her right foot and caught her left foot on something, she knows not what, and fell, thereby suffering personal injuries, affords no question for the jury."

For a very extended consideration of this class of cases see 100 A.L.R., pages 705-744.

Judgment reversed.

NICHOLS and CARTER, JJ, concur.